Ruffin, C. J.
 

 The two deeds are- exhibited and'their date and contents are as stated in the pleadings. That of the 30th day of May, 1823, is expressed to be for the eonsideixition of §300 then paid, and is for the fee unconditionally, and with covenants of general warranty and quiet possession. That of September 13th, 183G, recites that Ingram by deed conveyed the land to McRae on the 30th of May, 1823, and “ that the same had been in contest for many years with C. Watkins and others, and has-been recovered by judgment of the Supreme Court, and a writ of possession is now to issue and to be executed
 
 for the benefit of
 
 said McRae,” and then it witnesses,, “that the said Dennis, in whose name said suit has been
 
 *331
 
 carried on, and said writ is to be issued, in consideration of the premises and of the sum of $10 in hand paid to him by said McRae, hath granted, bargained, sold and confirmed, and doth grant, bargain and sell, and now actually confirm the said land to the said McRae and his heirs : And the said Dennis doth authorize and empower said McRae to have the said writ of possession sued out and executed in said Ingram’s name,, and the possession of said land to be delivered to him by'the sheriff of Anson, and when so delivered, the said McRae is
 
 to retain and hold the same to himself and his heirs in his, the said McRae’s own right.”
 

 The power of attorney is of the same date, and authorizes McRae to sue out a writ of possession, “ for a tract of land recovered in my name against C. Watkins and others, on Pedee, and containing about 20 acres, and to have said writ executed in my name, for said McRae to take actual possession of said tract and retain the same ; and also to settle and compromise, as he may deem proper, for the mesne profits of the said land, or sue and recover the same in my name, and apply the same, when recovered and received, to the payment and expenses and charges of the suit about said land. And the said McRae is hereby empowered to do all acts necessary to be done about recovering and taking possession of the said land and receiving and settling for the mesne profits.”
 

 The plaintiff examined a gentleman of the bar, who conducted the action of ejectment against Colson and Watkins, and who states that in July 1823, McRae and Ingram applied to him to bring suit for the land, and that McRae then showed him the deed from Ingram, and said he had taken it
 
 “to
 
 make himself safe,” or “to save himselfthat the witness brought the suit on the demise of Ingram, and it pended in various Courts until June 1836, when the plaintiff recovered ;■<That,: after . the -recovery, the witness advised McRae to take another deed,
 
 *332
 
 which Ingram agreed to give, and that the witness prepared the deed and power of attorney, bearing date September 13th, 1836, and.Ingram executed them and the witness attested them. At that time, the witness
 
 took anote from
 
 Ingram and McRae for $100, as a fee in the suit, but Ingram was known to be insolvent and the note was paid'by McRae’s administrator. McRae, pending the suit, had paid the witness $120 on account of the fee, and also to two other gentlemen of the bar $160 as •a fee — as the case was
 
 one of much 'doubt and
 
 had become of consequence to the parties, by the accumulation of a large amount of costs. He states that he relied on McRae almost entirely for the management of the suit, and that he attended to it throughout.
 

 The sheriff of Anson states, that when he put McRae in possession about the middle of Sept. 1836, he then mentioned to him, that after all the trouble in law, Ingram would get nothing, but that he, McRae, would get it and all the profit, and that McRae replied, “ that there would be a good deal coming to Dennis, but there was a long settlement
 
 to make, and
 
 his lawyers’
 
 fees
 
 and expenses in attending Court were to come out of "them.”
 

 Another wetness states, that Ingram owed him a debt, and in March 1887 lie applied to McRae to settle it, and McRae replied, " Ingram owes me about $100, and also for what I have paid as lawyers’ fees and expenses about $400 more ; and that they had not yet settled,
 
 but
 
 expected to do so before long; and I wish you would come when we settle, for after paying me there will be a balance going to Dennis, sufficient to pay his debts, unless he owes more than I think.” McRae also said he thought he ought to have something for his own trouble. He died about a month after the conversation.
 

 Another witness, Barnawell, states, that, about a month before McRae’s death, Ingram told McRae he wished their business arranged; that he wished the land sold
 
 *333
 
 and whatever he owed McRae paid out of the proceeds; and that McRae answered, that whatever remained after paying the debt to him belonged to Ingram. McRae also said he had paid all the expenses of the suit, and Ingram had not paid a dollar. Ingram stated that he intended to give McRae $100 extra for his services. McRae made no further reply.
 

 The defendants exhibited the covenant of McRae of May 20th, binding himself to pay Ingram $300, for the land upon being let into possession. It is of the tenor before set forth.
 

 They also proved by another gentleman of the bar, that, after the action of ejectment had been pending a considerable time, Ingram applied to him to appear for him, and the witness assented, provided the fee was secured. Ingram then said he had sold the land to McRae, who was to pay the lawyers’ fees and the other expenses, and also, in case the land should be recovered, was to pay him $500 for the price of the land. Ingram then requested McRae to be responsible for the fee, but he refused, saying that he would not employ any other lawyer, as he already had employed enough and had paid or agreed to pay more fees than the land was worth. The witness understood from both parties that the contract between them was in writing: That Ingram had made McRae an absolute deed for the land, and McRae had given him a paper to show what he was to pay upon a recovery.
 

 The bill states with great clearness a case for redemption. notwithstanding the conveyance was by an absolute deed. It states a fit occasion for the execution of some deed, as a security from one of the parties to the other; and, besides the direct averment of the intention, that it should operate only as a security, and that it should contain a clause to that effect, and that the omission of such a clause was occasioned by fraud or .accident, it states positively the very material circumstance, that McRae neither paid nor secured any price for the land. Upon
 
 *334
 
 that supposition, there would be a strong ground for saying, that the deed was given in the form it was, by surprise and the bill then uses the subsequent events with much skill, in order to shew that they are consistent with the idea, that a security and not a sale was intended. But the misfortune is, that the facts stated in the bill are not all the facts, and that others appear in the answer and proofs, which make a case very different from that which is so well told in the bill. The deed of May 1823 is not only absolute, but it appears
 
 to be
 
 founded on the consideration of $300 paid ; and, cotemporaneously with the execution of the deed, McRae, who is admitted to be a man of wealth, gave his obligation to Ingram for the sum of $300 therein expressed to be the purchase money for this land, and made payable whenever the purchaser should be let into possession. Of that part of the case the bill takes no notice whatever, but assumes the contrary. One cannot see how it is possible to get over that fact, in pursuing the enquiry, whether that deed was intended to be a security for a debt or b}' way of indemnity for responsibilities about to be assumed by the bargainee for the bargainor, unless it was given colorably for the purpose of deceiving Ingram’s creditors and that is not asserted. The obligation for the price, made at the same time with the deed and attested by the same witnesses, is as conclusive that the transaction was a purchase, as the most direct and credible evidence of the actual payment of the money would be. Nay, more so ; for if the money had been paid, there might have been a doubt, whether it was paid as a price, or advanced as a loan, and then leave the mind uncertain as to the character of the deed. But it is impossible to suppose, that the deed could be executed as a security for a sum to be advanced at an uncertain future day. Such a thing was never done, unless where a person wants an open credit with a banker, and to that end gives a security for all advances to cover whatever balances may be due from
 
 *335
 
 time to time. But a needy and insolvent man would never bind his estate with a mortgage upon such terms, though he might sell it to one, who was able and willing to support a law suit for the recovery of it, and agree to wait until the result of the suit for the payment of the price. An absolute deed is not indeed conclusive, that there was an absolute purchase. But it is almost so: and can only be avoided by some admissions of the defendant in his answer, or by a chain of circumstances that render it almost as certain, that it was intended as a security as if it had been expressed in the deed: such as the disparity between the sum advanced and the value of the property — the continued possession of the former owner— written admissions, for example, in stating accounts aá for mortgage money, and repeated and explicit declarations. But there is no case, we believe, in which relief has been given upon mere proof by witnesses of declarations by the party, in opposition to the deed and the answer. Here, there is nothing else, and the declarations themselves, far from being.clear and satisfactory to that point, but rather leading the other way. The bill, indeed, charges a great disparity between the value of the land and the price agreed to be paid. But the plaintiffs do not support that by proof, and it is hardly to be expected they could, as very little land in this State is worth $60 an acre throughout for agriculture. .Besides, the same land, when sold 20 years afterwards, on a credit, for partition, appears to have brought only $18 an acre, and McRae agreed to give $15 and be at much trouble to get it. The expression of McRae, that he took the conveyance from Ingram, “ to make himself safe” oiv “ to save himself” is very unsatisfactory. The witness is uncertain, indeed, which was the expression, and that may be material, for he might have meant, that he had saved a debt by buying the land, which would be consistent with the covenant, that he was “ to be accountable for the sum of $300 in settlement.” Or it might mean, that
 
 *336
 

 by
 
 buying- the land he had saved himself from the danger of losing what he might advance in the suit, by some other creditor of Ingram selling the land as soon, or even before the recovery. It. would seem scarcely credible, if this had been intended as a mortgage, that the counsel of the parties should not have been able
 
 to
 
 state it explicitly, or that a respectable member of the profession should have permitted, much less advised the parties — both his clients —that it was proper, after the recovery, that the mortgagor should, without any new consideration, execute a new deed, confirming the title under the former one, as if it were intended to be, as it is, absolute. Both of the parties attended to the suit, because both had an interest in it: McRae to get the land, and Ingram to get the price. The form in which the devise was laid was the only one in which it could have been laid, and therefore proves nothing, as to the intention. Then to another gentleman of the bar, both of the parties stated explicitly, that it was a sale, and indeed they gave an account of the transaction exactly in accordance with that appearing on the papers, except in mistaking the amount of the purchase money. The declarations spoken of byr the other witnesses only shew, that money would be
 
 coming to
 
 Ingram, which might be either as the price to be paid by McRae, or out of the rents, and do not shew any acknowledgement by McRae, that Ingram was entitled to the land. The only exception is in the testimony of Barnawell, from which it may be collected, there was some confidential understanding between the parties, without our being able to say what it was. But that cannot shake the deeds, and the other consistent circumstances.
 

 It was^argued at the bar, that, even if the transaction was intended to be as the defendants, insist it was, it ought to be relieved against, upon the ground that it was tainted with champerty, and was oppressive on the seller. But to that it must be answered, that no such ground is taken in the bill. As before remarked, the
 
 *337
 
 bill states with
 
 uncommon
 
 precision a case for redemption, as of a mortgage, and coniines itself to that case-Now that is inconsistent with the idea of champerty; for what part of the land is he to have, who only claims a security on it for money actually advanced? The bill alleges no oppression on Ingram or undue advantage taken of him, except in omitting the clause of redemption in the deed, as agreed for; and that is not established. It is true, that in respect of the second deed, the plaintiffs say, that Ingram was in McRae’s power and obliged to submit to his demands. But the bill thus speaks of that transaction, upon the supposition, that, under the first contract, Ingram had a right of redemption, and that the second deed was “ a release of the equity of redemption,” obtained without any consideration. Now, that view wholly fails, if the sale was in. tended to be absolute in the beginning, as it seems clearly to. have been. Then, supposing that the bill might have impeached that dealing upon the ground of champerty, and that the Court of equity would relieve upon that ground merely, yet (he bill has not raised that equity at a.li, and it cannot now be taken. But if it had been raised in the bill, the objection is clearly obviated by the deed of Sept. 1836; for. certainly, when a vendor has actually recovered the land which he had sold when out of possession, there can be no objection to his completing-his contract by’ executing a conveyance that will be valid. There needs no new consideration, because he has already received the price, or, which is the same thing, had it secured. The very purpose of the second deed was to confirm McRae’s title to the land, and entitle Ingram to the purchase money agreed on. There was no longer champerty, if there was at first. Whether 'Ingram has received the purchase money, or may still be entitled to it, is not the subject of enquiry in this suit. He. has other remedy for what may be due on that score. The claim to the sum received for mesne profits
 
 *338
 
 as stated in the bill, is incidental to Ingram’s right to the land as mortgagor ; and what is said about the form of the power, is not said with a view to assert a right to that money as an independent right, but for the purpose of proving that McRae did not claim them, and therefore that he had not purchased the land. When he is declared to have purchased the land in 1823, the mesne profits follow the title in this Court, though at law Ingram’s name was necessary to the recovery. So, we regard the power of attorney merely as authorizing the use of Ingram’s name for the benefit of McRae, in respect as well of the profits, as of the land itself — specifying only that McRae is thereout to reimburse himself for his advances in the suit, and not still claim them from Ingram. But, if that were otherwise, and Ingram became entitled to them, they were recovered in his name and received under his authority; then, that is a mere legal demand not incident to the equity of redemption claimed in the bill, and therefore might have been recovered at law. For that reason, this Court ought not to take jurisdiction of it, after objection distinctly taken in the answer. But if the Court would relieve at all, it cannot in this case, after a lapse of five years between the receipt of the money and the filing of' the bill, and the statute of limitations insisted on in the answer, as to that part of the demand.
 
 Hamilton
 
 v.
 
 Skepard,
 
 3 Murp. 115.
 
 Bell
 
 v.
 
 Beeman,
 
 Idem, 273.
 

 Upon the whole, therefore, the plaintiff can have no relief, and the bill must be dismissed with costs.
 

 Per Curiam.
 

 Bill dismissed with costs,